■ REBECCA JAMISON et al., Appellants, v GSL ENTERPRISES, INC., Defendant, and 1515 BROADWAY ASSOCIATES et al., Respondents. (And Other Actions.) [711 NYS2d 413] —Order, Supreme Court, Bronx County (Anne Targum, J.), entered on or about July 7, 1999, which, *inter alia,* denied plaintiffs' motion for partial summary judgment on liability and granted defendants' cross-motion for summary judgment dismissing the complaint, unanimously modified, on the law, to reinstate plaintiffs' first through eighth causes of action, and otherwise affirmed, without costs.

Plaintiffs brought this wrongful death action asserting claims under Labor Law §§ 200, 202, 240 (1) and § 241 (6) and common-law negligence, after their decedent, Willie Jamison (Jamison), was killed in a fall from a scaffold while washing windows. Jamison, an experienced window washer, was

employed by third-party defendants ISS International Service System and ISS Cleaning Services Group (collectively ISS). The accident occurred on September 16, 1994, when Jamison and his co-worker, Theodore Wrenn, were performing routine window cleaning at the Minskoff Theatre. The theatre was owned by defendant 1515 Broadway Associates (1515) and managed by defendant Compass Management and Leasing (Compass).

To clean the theatre windows, ISS workers used a two-person hydraulic-powered davit scaffold. The scaffold hung from a cable attached to a single point on an arm (the davit) that extended from a carriage running along a track bolted to the roof. Defendant Spider Staging Corp. (Spider) was the scaffold maintenance contractor who installed the single-cable scaffold, performed monthly maintenance and trained ISS workers on request. Compass was contractually obligated to report any problems to Spider and to maintain the scaffold in the intervals between Spider's monthly inspections. Spider's last inspection before the accident took place on September 7, 1994. No defects were found at that time.

In 1973, when Spider installed the scaffold, it obtained (on the owner's behalf) a Resolution of Special Approval (RSA) from the New York State Department of Labor, which allowed use of the single-cable scaffold on condition that "[a]t each work position, the scaffold shall be stabilized, through its descent and ascent, by two tag lines from the scaffold to two persons at street level." The purpose of the tag lines is to prevent the scaffold from tilting, because the fact that it hangs from a single cable in the middle makes it inherently unstable, like a see-saw. Nonetheless, these tag lines were not being used when the accident occurred. Rudolph Scott, the regular ISS supervisor of window washers, typically insisted on the use of tag lines, but he was on vacation that day.

On the day of the accident, Jamison and Wrenn were working on the scaffold, while a third worker, Fred Johnson, was on the roof. Each of the men on the scaffold was wearing a safety harness with a short lanyard that clamped onto a safety line by means of a rope grab. The lines hung down from the top of the building. As the scaffold went from floor to floor, they would slide the rope grabs up and down the safety line so that they were anchored at the level where they were working. The window washers were required to stay attached to the safety lines for protection in the event that they fell off the scaffold.

While defendant's expert engineer, Thomas O'Shea, stated afterwards that the safety lines were suspended independently

of the wire rope that suspended the scaffold, Wrenn testified that on the day of the accident, the safety lines were attached to the carriage of the scaffold assembly itself, not attached to the building. Notably, O'Shea did not examine the site until four years after the accident.

Spider's mechanic, Gregory Kopko, conceded that it would have been illegal and improper for the safety lines to be attached to the scaffold assembly. This was also among the violations cited by the Department of Labor when it inspected the premises after the accident: "Employer failed to provide vertical safety lifelines with anchorages that were independent of the means of suspending the employees. The lifelines on the Spider 6th floor setback single point suspension platform were anchored to the roof carriage which is part of the scaffold suspension system. Observed on or about 9/16/94."

According to Wrenn, the scaffold habitually got caught on the ledges around the theatre's window frames. When this happened, the workers would push the rig off the wall manually and use the reversing switch to guide the scaffold over the obstruction. However, neither Compass nor Spider recalled receiving any complaints about the scaffold malfunctioning.

Towards the end of the day, the scaffold once again became stuck on a protruding ledge that was four or five feet below the roof of the six-story theatre. This time, the scaffold unexpectedly began to tilt, front to back, with the cable unraveling as it tilted. Jamison tried to use the reversing switch to raise the scaffold, but it did not work properly. Scott later testified that there had been similar problems with the reversing switch in the past.

Afterwards, Wrenn thought that Jamison had managed to stop the scaffold's descent by putting the switch in neutral, whereas Johnson thought that the scaffold kept falling. In any event, Jamison and Wrenn were unable to push the scaffold off the window frame as they had in the past. According to Johnson and Wrenn, Jamison then tried to use the reversing switch to make the scaffold go back up to the roof, but this only caused it to tilt even more, as if it was about to flip over and toss them out. Wrenn twice called for help on his two-way radio, as Spider's training staff had instructed him to do, but received no answer.

At this point, Wrenn and Jamison made the fateful decision to abandon the dangerously tilting scaffold and try to reach the roof. They disconnected themselves from their safety lines. Wrenn explained later that he believed that he could not get out of the scaffold unless he unhooked his belt from the safety

line. The lanyard on the safety belt, which was hooked to the rope grab, was only three or four feet long. To move further up the line and reach the roof, he would have had to move the rope grab up the line, but he could not do that without letting go of the scaffold. He made a judgment call that he would be better off trying to climb to safety than trusting his life to the safety line, since he did not know when the line had last been tested.

As Wrenn stepped onto the top railing of the scaffold, it kicked out from under him and swung away from the building. He was able to pull himself up onto the roof, but Jamison was not so fortunate. Unable to grab onto the wall, he fell off the scaffold to his death.

After the accident, Kopko examined the scaffold and found no malfunctions. He did not experience any problems when he rode it up and down the bottom two floors. The Department of Labor issued a "Cease Use" order and cited numerous violations. Royal Smith, the Department of Labor inspector, concluded that the absence of tag lines contributed to the accident because they could have stabilized the scaffold. On the other hand, Smith also thought that the seriousness of the injury could have been prevented if Jamison and Wrenn had followed the emergency evacuation procedure they had been taught, namely to remain harnessed to the safety lines.

The motion court denied plaintiffs' motion for partial summary judgment on liability and granted defendants' cross-motions for summary judgment dismissing the complaint. The court concluded that there was no statutory violation because the scaffold and safety lines were working properly and that the proximate cause of the fatal accident was Jamison's decision to detach himself from his safety line. The court accepted defense expert O'Shea's opinion that the tag lines would not have prevented front-to-back tilting. With respect to defendants Compass and 1515, the court added that even if the scaffold caused the accident, plaintiffs could not recover because Jamison was a "recalcitrant worker" who deliberately refused to use an available safety device. With respect to defendant Spider, the claims were dismissed on the grounds that Spider did not supervise, direct or control the ISS workers' use of the scaffold. The court also dismissed the ninth and tenth causes of action pursuant to Labor Law § 241 (6) on the grounds that this statute does not apply to routine maintenance such as window cleaning (*Retamal v Miriam Osborne Mem. Home Assn.*, 256 AD2d 506, 507).

We reinstate plaintiffs' causes of action because questions of

fact exist as to proximate cause. With respect to the Labor Law § 200 and common-law negligence claims, there is also a factual dispute as to whether Jamison, faced with an emergency situation, was merely comparatively negligent in disconnecting his safety belt in an attempt to escape the tilting scaffold. The scope of Spider's control over the window washers' work environment is also a triable issue. However, the section 241 (6) claims were properly dismissed on the grounds specified by the motion court (*Retamal v Miriam Osborne Mem. Home Assn.*, *supra*).

Relying on the post-accident reports of the Department of Labor and Spider that showed no hardware defects, the IAS Court found that there was no evidence that the scaffold was "defectively constructed, placed or operated so as not to give proper protection" to the worker as required by Labor Law § 240 (1). However, this conclusion ignores the eyewitness testimony of Wrenn and Johnson, as well as the testimony of their supervisor, Rudolph Scott, to the contrary. All three testified to the recurring problem with the reversing switch. The very fact that the scaffold tilted without an apparent reason is prima facie evidence of a statutory violation (*see, Bras v Atlas Constr. Corp.*, 166 AD2d 401). Moreover, Wrenn claimed that the safety lines were rigged to the scaffold carriage, which was against regulations. When these allegations are considered along with the absence of tag lines and the lack of response to Wrenn's radio distress call, it cannot be said as a matter of law that defendants complied with their duty to provide a safe work site under Labor Law §§ 200, 202 and 240 (1) (*see, Smith v Hovnanian Co.*, 218 AD2d 68, 71-72 [question of fact whether absence of tag lines was proximate cause of injuries sustained by worker when he was pinned to wall by rotation of a load of sheetrock]; *Zeitner v Herbmax Sharon Assocs.*, 194 AD2d 414 [unresolved fact issues concerning cause of accident]).

Nor can it be said with certainty that Jamison's decision to unhook his safety line was the sole proximate cause of the accident (*see, Orlin v Colgate Scaffolding Corp.*, 248 AD2d 114, 115). In light of Wrenn's testimony that they could not exit the unsafe scaffold without unhooking the safety lines, as well as the evidence suggesting that the safety lines were not properly attached to the building, it is for the jury to decide whether it was practicable for the workers to remain attached to the safety lines while trying to reach the roof (*see, Andross v Trustees of Columbia Univ.*, 287 NY 160).

For the same reason, defendants are not entitled to summary judgment based on their contention that Jamison was a

recalcitrant worker (*Milewski v Caiola*, 236 AD2d 320 [even if plaintiff was recalcitrant in not using safety harness, defendant's failure to provide safe planking where plaintiff was standing was a more proximate cause of the accident]). Liability may be imposed under the Labor Law notwithstanding a worker's refusal to use a safety belt, if the safety belt was not properly rigged so as to give adequate protection to the worker (*see, Rich v State of New York*, 231 AD2d 942, 943; *Murray v Niagara Frontier Transp. Auth.*, 199 AD2d 984, 985, *lv denied* 1994 NY App Div LEXIS 3526, 1994 WL 72879).

Here, Wrenn and Jamison were faced with an emergency situation that called for a quick decision about the best way to escape the malfunctioning scaffold (*see, Mas v Two Bridges Assocs.*, 75 NY2d 680). They could not wait indefinitely for rescue, especially since they were unable to send out a distress call on their radios (*compare, Antonik v New York City Hous. Auth.*, 235 AD2d 248, *lv denied* 89 NY2d 813). There is an issue of fact as to whether their conduct was a foreseeable response to the emergency that defendants' negligence allegedly created (*Humbach v Goldstein*, 255 AD2d 420).

Whether Jamison was comparatively negligent ultimately depends on the reasonableness of his perception that the safety lines were not reliable. This question cannot be answered on summary judgment because there is conflicting evidence as to the configuration of the safety lines. Furthermore, Jamison's alleged comparative negligence is not relevant to plaintiffs' Labor Law §§ 202 and 240 (1) claims because these statutes impose absolute liability once a violation is shown (*Beckford v City of New York*, 261 AD2d 158; *France v Abstract Tit. Div.*, 50 AD2d 711), though it may be a defense to plaintiffs' section 200 and common-law negligence claims (*Siragusa v State of New York*, 117 AD2d 986, *lv denied* 68 NY2d 602).

The motion court found that Spider did not fall within the class of those having nondelegable liability under Labor Law §§ 202 and 240 (1) because it did not exercise any control over the operation of the scaffold, nor did it supervise or control Jamison's work. For the same reasons, Spider could not be said to have notice of the allegedly unsafe conditions that caused Jamison's fall, which is a prerequisite for the section 200 and common-law negligence claims (*Russin v Picciano & Son*, 54 NY2d 311). We disagree.

According to plaintiffs, Spider not only built and regularly maintained the scaffold, but also trained ISS employees to use the scaffold and related safety equipment and certified to the Department of Labor which employees were permitted to use it

(*see, Drzewinski v Atlantic Scaffold & Ladder Co.*, 70 NY2d 774, 776-777 [scaffolding contractor who "contracted to provide, erect and maintain the scaffolding and other equipment for the safety of those working on the job" was liable under section 240 (1)]). Scott also testified that if a worker needed to evacuate a malfunctioning scaffold, he should use the radio to "call the building office of security in the lobby and get Spider to come in."

However, Spider claims that it did not make certifications to the Department of Labor and merely sent documents to ISS reflecting instruction of its employees. Spider also disputes plaintiffs' characterization that it was involved in ongoing training of the window washers, as opposed to one-time instruction. Moreover, while Spider played a role in setting the safety guidelines and had once rescued ISS workers from another malfunctioning scaffold, Spider argues that mere supervisory authority over safety standards is legally insufficient to establish the requisite control (*Ricotta v Praxis Biologics*, 265 AD2d 878). In light of these contradictory allegations, the scope of Spider's authority over the work site is for a jury to resolve (*Rizzuto v Wenger Contr. Co.*, 91 NY2d 343). Concur—Rosenberger, J. P., Tom, Mazzarelli, Andrias and Saxe, JJ.